### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

RANDY KLUMP,

       Plaintiff,                      CASE NO. 08-10120

v.                               DISTRICT JUDGE THOMAS LUDINGTON
                                   MAGISTRATE JUDGE CHARLES BINDER

OGLEBAY NORTON MARINE
SERVICES COMPANY, LLC;
OBLEBAY NORTON MARINE
MANAGEMENT COMPANY, LLC;

       Defendants.
_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO STRIKE EXPERT REPORT
(Doc. 24, 30)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion For Summary Judgment be **GRANTED**, that the case be dismissed in its entirety, and that Defendants' Motion To Strike Expert Report be **DENIED AS MOOT**.

## II.    REPORT

### A.    Introduction

On January 8, 2008, Plaintiff Randy Klump commenced this admiralty suit against Defendant Oglebay Norton Marine Services Company, LLC, and Defendant Oglebay Norton Marine Management Company, LLC (hereafter collectively referred to as "Defendant"). By order of United States District Judge Thomas L. Ludington, Defendant's Motion For Summary Judgment and Motion to Strike the Expert Report of Roger L. Wabeke were referred to the undersigned

Magistrate Judge on January 12, 2009 (Doc. 25), and February 6, 2009 (Doc. 34), respectively. Plaintiff responded to the motion for summary judgment (Doc. 28) and Defendant filed a reply. (Doc. 29.)  Plaintiff filed a response to the motion to strike.  (Doc. 37.)  Oral argument on both motions was held on February 11, 2009.  Pursuant to the Court's direction, the parties filed supplemental briefs. (Doc. 38, 39.)   Therefore, the motions are ready for report and recommendation.

### B.    Background Facts

The facts are undisputed.  Plaintiff works as a crewmember on the M/V David Z. Norton.[1] This case arises out of events occurring on June 9, 2006, while Plaintiff was returning from shore leave and reporting back to Defendant's vessel at Calcite Harbor, which is near Rogers City, Michigan.  (Pl.'s Resp. Br., Doc. 28 at 10.)  Plaintiff had been home visiting with his family in Rogers City and rode his bicycle back to the vessel.  (Doc. 28 at 11.)  At oral argument, defense counsel clarified that a gated area that must be traversed to reach the vessel and its adjoining dock is owned by O-N Minerals Company, which is a subsidiary of Defendant, but which is a separate and distinct entity.   While in this area, approximately 100 feet or more away from the vessel, Plaintiff encountered loose gravel and fell off his bicycle, injuring his clavicle.  (*Id.*)[2]  Due to his injury, Plaintiff was deemed unfit for duty for over a year until August 2007, at which time he returned to work.  (Doc. 28 at 12.)  During this time, Plaintiff received maintenance and cure for his injuries.  Plaintiff asserts both a Jones Act negligence claim, 46 U.S.C. § 30104 *et seq.*(Count I), and an unseaworthiness claim (Count II).  (Compl., Doc. 1 at 1-5, 5-9, respectively.)

---

[1]The David Z. Norton is a 630-foot self-unloading vessel which carries iron ore, coal and stone on the Great Lakes.

[2] More details regarding the exact location where the injury occurred will be addressed in the body of this Report.

2

### C.     Motion Standards

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  All facts and inferences must be viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence.  *Matsushita*, 475 U.S. at 587-88.  Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof.  *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).  When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist.  *Street*, 886 F.2d at 1479-80.  Instead, the court will rely upon the "facts presented and designated by the moving party."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).  The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent

to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406. "Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008) (granting summary judgment where plaintiff supported each allegation of racial animus only with citation to his own testimony stating his opinion that he was the victim of racial harassment).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### D.    Jones Act

### 1.    Standards

The Jones Act provides:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104, as amended in 2006. The corresponding statute applying to railway employees is the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*[3]

---

[3]45 U.S.C. § 51 provides:

Every common carrier by railroad while engaging in commerce...shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce...for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of defect or insufficiency, due to its negligence, in its cars, engines,

At oral argument, Plaintiff's counsel intimated that the 2006 amendment to the Jones Act was significant in that it expressly incorporated FELA.  However, I note that the previous version of the Jones Act already expressly incorporated all portions of FELA as it modified or extended the common law.  46 U.S.C. § 688.[4]  In addition, case law prior to the recent amendment of the Jones Act recognized the harmony between FELA and the Jones Act.  *See, e.g., The Arizona v. Anelich*, 298 U.S. 110, 118, 56 S. Ct. 707, 80 L. Ed 1075 (1936) (FELA is incorporated in the Jones Act by reference); *Hopson v. Texaco*, 383 U.S. 262, 263, 86 S. Ct. 765, 15 L. Ed. 2d 740 (1966) (the Jones Act "incorporates the standards of the Federal Employers' Liability Act . . . "); *Daughenbaugh v. Bethlehem Steel Corp., Great Lakes Steamship Div.*, 891 F.2d 1199, 1204 (6th Cir. 1989).  Thus, the recent amendment did not substantively alter the Jones Act but rather clarified that FELA and cases interpreting FELA are applicable, in all aspects, to the Jones Act and cases interpreting the Jones Act.  At the threshold, therefore, I find the amendment less significant than advanced by Plaintiff's counsel.

The Jones Act allows a seaman to bring claims for personal injury suffered in the course of employment that were caused by their employer's negligence.  In a Jones Act negligence action, the duty element is the employer's duty to provide a safe workplace for its employees.  *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 907 (6th Cir. 2006).  If a plaintiff establishes that the employer breached that duty, the Jones Act relieves the plaintiff from having to prove proximate cause, as one would be required to do in a standard negligence claim.  Instead, "[u]nder the Jones

---

appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

[4]46 U.S.C. § 688 provided:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply...

Act, a plaintiff need only show that the defendant's actions, however slight, contributed in some way toward causing the plaintiff's injuries." *Miller v. American President Lines, Ltd.*, 989 F.2d 1450, 1463 (6th Cir. 1993) (citing *Gosnell v. Sea-Land Service, Inc.*, 782 F.2d 464, 467 (4th Cir. 1986)). Plaintiff "must produce some evidence of negligence" because "[t]he mere fact of injury is not sufficient." *Rutherford v. Lake Michigan Contractors, Inc.*, 28 Fed. App'x 395, 400 (6th Cir. 2002). If a plaintiff's "negligence is the sole cause of his injuries," he cannot recover. *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001); *Hughlett v. Oglebay Norton Marine Servs. Co., LLC*, No. 1:04 CV 01821, 2007 WL 781327, at *2 (N.D. Ohio Mar. 12, 2007) (granting summary judgment because plaintiff's negligence was the sole cause of his injury when he pulled hard on the mooring cable knowing there was insufficient slack, despite plaintiff's contention that the winch operator should have watched him rather than the winch).

"Maritime law espouses a system of comparative negligence" such that the "doctrine of contributory negligence . . . does not preclude a plaintiff from complete recovery on unseaworthiness or Jones Act claims." *Churchwell*, 444 F.3d at 908. Similarly, the assumption of risk defense does not apply to either unseaworthiness or Jones Act maritime actions. *Id.* at 909.

> In sum, to survive summary judgment in this [Jones Act] action, [plaintiff] had to create a genuine issue of material fact regarding whether (1) she was a seaman; (2) she was acting in the course of her employment at the time she suffered her injury; and (3) [defendant] or its agents played any part in causing [plaintiff's] injury.

*Rannals v. Diamond Jo Casino*, 265 F.3d 442, 448 (6th Cir. 2001).

### 2.    Discussion

The first element is not in dispute. Therefore, the salient issues are whether Plaintiff was acting in the course of his employment at the time of the injury and whether Defendant or its agents played any part in causing the injury.

### a.       Acting in the Course of Employment

The seminal and thus oft-cited case on this topic is *Aguilar v. Standard Oil Co. of New Jersey*, 318 U.S. 724, 63 S. Ct. 930, 87 L. Ed. 1107 (1943).  In *Aguilar*, the plaintiff seaman left the vessel to go on shore leave.  As he proceeded down the pier toward the street, the lights were extinguished and, in the darkness, he fell into an open ditch and was injured.  The plaintiff sued for maintenance and cure.  The United States Supreme Court noted that the law has sought to secure the "combined object of encouraging marine commerce and assuring the well-being of seaman [and therefore] maritime nations have imposed broad responsibilities for their health and safety upon the owners of ships."  *Id.*, 318 U.S. at 727-28.  The Court went on to note that "[a]mong the most pervasive incidents of the responsibility anciently imposed upon a shipowner for the health and security of sailors was liability for the maintenance and cure of seamen becoming ill or injured during the period of their service."  *Id.*, 318 U.S. at 730.  This "obligation has been recognized consistently as an implied provision in contracts of marine employment [and since the liability is] [c]reated thus with the contract of employment, the liability, *unlike that for indemnity or that later created by the Jones Act*, in no sense is predicated on the fault or negligence of the shipowner."  *Id.* (emphasis supplied).

The Court then addressed the novel issue of "the existence and scope of the shipowner's duty when the seaman is injured while on shore leave but without specific chore for the ship."  *Id.* at 733.  The Court concluded that "the principles governing shipboard injuries apply to the facts presented. . . . Men cannot live for long cooped up aboard ship without substantial impairment of their efficiency. . . . Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly."  *Id.* at 733-34.  The Court reasoned that "it is the ship's business which subjects the seamen to the risks attending hours of relaxation in strange

7

surroundings . . . [and] it is reasonable that the business extend the same protections against injury from them as it gives for other risks of employment [because] [i]t was from considerations of exactly this character that the liability for maintenance and cure arose." *Id.* at 734. The Court held that "[t]here is strong ground therefore for regarding the right to maintenance and cure as covering injuries received without misconduct while on shore leave." *Id.* at 735. Thus, the *Aguilar* case focused on the nature of maintenance and cure when it formulated its conclusions. That same rationale would not appear to apply in Jones Act cases, as the Court in *Aguilar* so adroitly distinguished.

However, in *Braen v. Pfeifer Oil Transp. Co., Inc.*, 361 U.S. 129, 132-33, 80 S. Ct. 247, 4 L. Ed. 2d 191 (1959), the Supreme Court, citing *Aguilar* and *Warren v. United States*, 340 U.S. 523, 529, 71 S. Ct. 432, 95 L. Ed. 503 (1951),[5] and noting that they both were maintenance and cure cases, nonetheless concluded that "[t]hey also supply relevant guides to the meaning of the term 'course of employment' under the [Jones] Act since it is the equivalent of 'service of the ship' formula used in maintenance and cure cases." *Braen*, 361 U.S. at 132-33. The Court cited *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 63 S. Ct. 488, 87 L. Ed. 596 (1943),[6] a treatise, and *Marceau v. Great Lakes Transit Corp.*, 146 F.2d 416 (2d Cir. 1945).[7] The Court

---

[5]The Court in *Warren* cited *Aguilar* and held that the plaintiff was entitled to maintenance and cure where he was injured while on shore leave sightseeing.

[6]The facts in *O'Donnell* closely parallel those in *Braen*. In *O'Donnell*, while the ship was discharging its cargo through a conduit from the ship's hatch to a land pipe, the plaintiff seaman was ordered by the master to go ashore and assist repair of the gasket connection. The alleged negligence of a fellow employee caused a heavy counterweight, used to support the gasket, to fall on him and injure him. *O'Donnell*, 318 U.S. at 38. The lower court held that the seaman was entitled to maintenance and cure but could not recover under the Jones Act since his injury did not occur on navigable waters. The Court reversed, holding that the "right of recovery in the Jones Act is given to the seaman as such, and, as in the case of maintenance and cure, the admiralty jurisdiction over the suit depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters." *Id.* at 42-43. As in *Braen*, the plaintiff seaman was acting under orders and was repairing an appurtenance of the ship.

[7]*Marceau* sets forth what is now referred to as the ingress/egress doctrine. *See infra.*

in *Braen* held that the plaintiff seaman was acting in the course of his employment when he was obeying his supervisor's orders to lay decking on a raft that was used for welding and painting, and was injured while standing on a catwalk doing preparatory work. Since the plaintiff was acting under orders and was preparing to do the ship's work, it is not surprising that the *Braen* court concluded he was acting within the scope of his employment.

However, later cases have applied the maintenance and cure rationale stated in *Aguilar* to Jones Act cases in situations unlike those described in *Braen,* i.e., in factual scenarios where the plaintiff is not acting pursuant to the employer's direction. This obfuscation of the course of employment concept can be found in *Daughenbaugh v. Bethlehem Steel Corp., Great Lakes Steamship Div.*, 891 F.2d 1199 (6th Cir. 1989). In *Daughenbaugh*, the vessel was moored at a dock owned by a subsidiary of the vessel owner. A dirt road ran the length of the dock and it was covered with unimproved soil, iron ore pellets, weeds and trash. *Id.* at 1200. The vessel owner had an "unwritten policy that permitted an intoxicated seaman to board ship [and,] [t]o promote safety, [] the intoxicated seaman would be escorted to his room." *Id.* In addition, the officers and crew had their own "unwritten rule and policy to look out for each other during shore leave." *Id.* at 1201. The plaintiff[8] went on shore leave to get a haircut and then met several other crew members at a local bar. Eventually, the plaintiff was "cut off" by the bartender because he had become visibly intoxicated. *Id.* Two crew members decided to accompany and assist the plaintiff in his return to the ship. However, they took a short-cut on a service road, and squeezed through the locked service gate of the dock. *Id.* The plaintiff ran ahead of them, making gestures like a young boy flying an airplane, and disappeared behind the conveyor house. *Id.* He was not seen

---

[8]Actually, the plaintiff is the deceased crew member's wife, but for simplification purposes, the crew member will be referred to as the plaintiff.

again until his body was discovered floating in a slip at the south end of the dock. *Id.* at 1202. The plaintiff brought an unseaworthiness claim and a Jones Act claim. *Id.*

The Sixth Circuit first noted that its "application of the Jones Act must follow the judicially developed doctrine of liability granted to railroad workers by [] FELA." *Id.* at 1204. The court rejected the defendant's argument that the plaintiff was not acting in the course of his employment at the time of his death. *Id.* at 1206. The court cited *Braen, Aguilar, Marceau, and McDonough*[9] and summarized that "when a seaman is traveling along a standard route to leave the ship and go ashore or to return to the ship from shore leave, the seaman is acting within the course of his employment under the Jones Act." *Id.* The Sixth Circuit concluded that the plaintiff, "like the seaman in *Aguilar*, was properly deemed on defendant's business while returning from shore leave, because shore leave for the crew is beneficial and *necessary* to defendant's continued operation of the [vessel]." *Id.* at 1206 (emphasis in original). The court further held that although plaintiff, "at the time of his death, was not performing routine tasks at the request of defendant, [he] was 'generally answerable to [the shipmaster's] call to duty.'" *Id.* (quoting *Farrell v. United States*, 336 U.S. 511, 516, 69 S. Ct. 707, 93 L. Ed. 850 (1949)). Therefore, the Sixth Circuit held that "on the night of his disappearance, Daughenbaugh, while returning from shore leave by the route

───────────────

[9]In *McDonough v. Buckeye S.S. Co.*, 103 F. Supp. 473, 475 (1951), the vessel owner's employees had a policy and practice of assuming control over seamen who were too intoxicated to return to the vessel alone. If no other sober shipmate was available on shore, the practice was to call the ship, at which point the officer in charge would either personally go ashore or send another to assist the drunken seaman to the vessel. A drunken McDonough was assisted by a shipmate who could not lift McDonough into the vessel alone. He went aboard to find more help, and by the time he returned, McDonough was missing. *Id.* at 475. McDonough's body was recovered later. The district court found that McDonough was acting in the course of his employment when being escorted pursuant to the recognized practice. *Id.* The court carefully noted that its opinion did not impose an affirmative duty to undertake such a policy of assuming responsibility for safe passage to and from shore leave. In addition, the court compared its holding with cases applying the common law rule that even in absence of a duty to help others, one who voluntarily undertakes the duty to help others must exercise reasonable care for the welfare and safety of the one assisted. *McDonough*, 103 F. Supp. at 476. *Cf. Robinson v. Northeaster Steamship Corp.*, 228 F.2d 679 (2d Cir. 1956) (plaintiff was not acting within the course of employment and negligence could not be imputed to employer where fellow shipmate voluntarily, i.e., without the employer's request, authorization, and without a general custom or policy of such authorization, escorted a drunken plaintiff back to vessel).

customarily taken by the [vessel] crew, was acting in the course of his employment." *Id.* at 1207.

However, I suggest that the Sixth Circuit's reliance on *Farrell* is misplaced. *Farrell* was a maintenance and cure case which cited *Aguilar* for its teaching that "logically and historically the duty of maintenance and cure derives from a seaman's dependence on his ship, not from his individual deserts, and arises from disability, not from anyone's fault [thus the court] refused to look at the personal nature of the seaman's activity at the moment of injury to determine his right to reward." *Farrell*, 336 U.S. at 515-16. Accordingly, "[a]side from gross misconduct or insubordination, what the seaman is doing and why and how he sustains his injury does not affect his right to maintenance and cure . . . [h]e must, of course, at the time be 'in the service of the ship,' by which is meant that he must be generally answerable to its call to duty rather than actually in performance of routine tasks or specific orders." *Id.* at 516.

Whatever its analytical defects, however, *Daughenbaugh* remains the law in the Sixth Circuit and must guide this court's analysis. Under *Daughenbaugh*, since Plaintiff was "returning from shore leave by the route customarily taken by the [vessel] crew, [he] was acting in the course of his employment." 891 F.2d at 1207. Thus, I suggest that summary judgment on the element of course of employment should be denied.

FELA cases also support this conclusion. Cases interpreting FELA have held that an employee is acting in the scope of his employment while traversing the employer's property to come to or leave from work. "In leaving the carrier's yard at the close of his day's work the deceased was but discharging a duty of his employment . . . . Like his trip through the yard to his engine in the morning, it was a necessary incident of his day's work . . . ." *Erie Railroad Company v. Winfield*, 244 U.S. 170, 173, 37 S. Ct. 556, 61 L. Ed 1057 (1917) (holding deceased was employed in interstate commerce at time he was leaving work by crossing track and was struck by

11

an engine).  These types of cases are referred to as the "traversing" cases.  *See Ponce v. Northeast Illinois Regional Commuter Railroad Corp.*, 103 F. Supp. 2d 1051, 1057 (N.D. Ill. 2000) (and cases cited therein).

Beyond the employer's place of business, "employees injured while commuting to and from work are not considered to be within the scope of their employment for FELA purposes."  *Loya v. Denver & Rio Grande Western Railroad Company,* 993 F.2d 1551 (10th Cir. 1993) (and other circuit court cases cited therein); *Ponce*, 103 F. Supp. 2d at 1057 (and cases cited therein).  This rule has been dubbed the "commuter rule."  *Id.* (granting summary judgment where plaintiff was injured in a car accident while returning from his home to his job on weekend when railroad exercised no control over his activities nor his means of transportation).  The rule stems from the policy behind FELA to protect railway workers from the dangers associated with railway work, not the risk associated with commuting to which all passengers are exposed.  *Ponce*, 103 F. Supp. 2d at 1058 (citing *Caillouette v. Balt. & Ohio Chicago Terminal R. Co.*, 705 F.2d 243, 246 (7th Cir. 1983)).

"[W]hether a case falls within the 'commuter' rule or the 'traversing' rule is driven by the facts of that particular case."  *Ponce*, 103 F. Supp. 2d at 1057 (finding plaintiff was acting in the scope of his employment while still on defendant's property when stepping onto commuter train to leave for home at the end of the workday).  "In general, however, the two lines of cases teach that whether an injury is the result of commuting or traversing turns principally on (1) whether the employee is on the work site itself, and thus exposed to risks to which the general public is not subject, and (2) whether he or she is within reasonable proximity - both in terms of time and space - to where the actual work was performed that day."  *Id.*

In the instant case, Plaintiff was not on the work site (vessel) nor was he attempting to board the vessel, but rather was at least 100 feet from the vessel. However, since he had entered the gated area owned by Defendant's subsidiary, it is arguable that he was exposed to risks to which the general public is not exposed. It is also arguable that Plaintiff was within reasonable proximity in terms of time and space to where the work of the day was to be performed. I therefore suggest that application of the commuting versus traversing test reveals a question of material fact whether Plaintiff would be considered to have been commuting or traversing at the time of the alleged injury.

Several cases cited in Plaintiff's supplemental brief (Doc. 38 at 3-7) provide additional support, although several other cases cited are factually distinguishable and inapposite.[10]

In *Kooker v. Pittsburgh & Lake Erie Railroad Co.*, 258 F.2d 876 (6th Cir. 1958), the crew had a "practice" on the days the crew worked on an interchange yard some 2 ½ to 4 miles east of the terminal building. They would meet at the terminal building, at which time all but one crew member would ride to the interchange yard on an engine that would be left there for the next crew and the remaining crew member would drive his own car to the interchange yard so the earlier crew would have transportation back to the terminal building. *Id.* at 877. On the day the plaintiff

---

[10]*Shenker v. The Baltimore and Ohio Railroad Co.*, 374 U.S. 1, 83 S. Ct. 1667, 10 L. Ed. 2d 709 (1963), is not directly on point because its holding is limited to the conclusion that "B & O had a duty to inspect PE cars before permitting its employees to work with them." *Id.* at 8. *Bountiful Brick Co. v. Giles*, 276 U.S. 154, 48 S. Ct. 221, 72 L. Ed. 507 (1928), is not persuasive since it involved a claim made under the Utah Workmen's Compensation Act. *Goldwater v. Metro-North Commuter Railroad,* 101 F.3d 296 (2d Cir. 1996), is factually inapposite since it involved a plaintiff who was waiting for a train so she could attend, per her employer's instruction, a safety meeting held at a different office of the defendant's from the one where she normally worked when she was assaulted, thrown onto the tracks and injured. *Sassaman v. Pennsylvania R. Co.*, 144 F.2d 950 (3rd Cir. 1944), is inapposite since the plaintiff's injury occurred while riding defendant's train and the court held that "[w]hen the plaintiff descended from his place of employment to the defendant Jersey City Station, he was free to travel home or go elsewhere, as suited his desires, by whatever means of transportation he chose. . . . There was absent, therefore, the employer compulsion as to the mode of travel to and from work which serves to attach or continue the employee relationship, away from the place of employment, and makes an interstate employee's right of recovery for injury remediable under the Federal Employer's Liability Act.")

was injured, he was the one designated to drive his own car and he was injured while descending the path from his parked car, which was on B & O railroad property, to the interchange yard owned by the defendant. *Id.* The Court noted that in order to get to the interchange yard from the parking area, the plaintiff had to cross this area and that the plaintiff and other crew members had long been compensated for the time spent traveling to the interchange yard. *Id.* at 878. Similarly, in the instant case, the seaman had to travel over O-N Mineral's property to reach the vessel.

In *Carter v. Union Railroad Co.*, 438 F.2d 208 (3rd Cir. 1971), the crew's starting point each day was a shanty located at the nearby General Motors ("GM") plant pursuant to an agreement made by the president of the railroad with GM that would allow the railroad workers to use the GM lot to park their cars. *Id*. at 209. The crew was aware of the agreement and many took advantage of the allowed use of the GM parking lot, although not all of them did. *Id.* at 210. The court held that since the plaintiff "was injured while en route to his very job from a parking lot provided for his use [] he was clearly within the course of his employment" even though the property was owned by GM because the "use [of GM's property] was within the expectations and intentions of the railroad." *Id.* Therefore, the court allowed negligence attributed to GM to be imputed to the railroad to provide a safe place to work. *Id.* at 211. In the instant case, travel over O-N Minerals' property to reach the vessel was allowed and within the expectations and intentions of Defendant.

As a result, I suggest that under Sixth Circuit precedent, *Daughenbaugh*, and cases interpreting FELA, there is a genuine issue of material fact regarding whether Plaintiff was acting in the course of employment at the time of his injury. I further suggest that summary judgment should not be granted on this ground.

14

**b.**      **Whether Defendant or Its Agents Played a Part in Causing the Injury**

**i.**      **Imputing Action (or Inaction) of a Third Party to Defendant**

In *Rannals, supra*, the plaintiff was a deckhand on a riverboat casino in Dubuque, Iowa. The plaintiff and three other employees of the defendant traveled to Toledo, Ohio, in a rental car provided by the defendant to attend a training program for firefighting. *Rannals*, 265 F.3d at 446. The defendant paid the tuition costs and reasonable expenses for food, lodging, and transportation for the employees to attend the program and the defendant compensated them at their regular pay rate for that week of training. *Id.* Employees of the defendant were not required to attend the program but completion of this training was a prerequisite for promotions to supervisory positions. *Id.* During the week, while leaving a session and discussing evening plans with her co-workers, the plaintiff stepped off the grass and onto the training center's driveway, which was icy, slipped, fell, and fractured her ankle. *Id.*

After concluding that there was a genuine issue of material fact as to whether Plaintiff was in the course of her employment, the Sixth Circuit cited precedent establishing that "a third party's negligence in providing a safe workplace for an employer's workers may be imputed to the employer where the third party has a contractual relationship with the employer and the employee is acting in the course of her employment on the third party's premises." *Rannals*, 265 F.3d at 450 (citing *Hopson, supra*.) The court found that the defendant's contractual relationship with the training center resulted in the training center becoming an agent of defendant and thereby exposing defendant to liability for negligence committed by the training center in failing to provide a safe workplace. *Id.* at 450. The court analogized to cases holding that a "'shipowner is liable for the negligence of an on-shore physician *that it hires to treat a crewman.*'" *Id.* (quoting *Olsen v. American S.S. Co.,* 176 F.3d 891, 895 (6th Cir. 1999) (emphasis added in *Rannals*)). The court

15

relied on "evidence that [defendant] entered into a contractual relationship with the training center when it chose the training center to teach its employees firefighting skills, made the arrangements for its employees to attend the training program, and paid the training center for such services, and the training center accepted such work by accepting [defendant's] employees into its seminar and allowing them to attend its courses." *Rannals*, 265 F.3d at 450-51. The court also noted that defendant had sent its employees to the training center on two previous occasions such that defendant and the training center had "developed an understanding that [defendant] would send its employees to learn valuable firefighting skills at the seminar and that the training center would train and teach such employees in a safe work environment." *Id.* at 451. Therefore, the court held that defendant "is still responsible for the negligence of its agent, in this case, the training center for its fail[ure] to cure dangerous icy conditions at the program." *Id.*

Cases interpreting FELA have similarly held that negligence of a third party may be imputed to the employer under FELA where the employee is in some way encouraged or required by the employer to stay at a particular lodging establishment. *Duncan v. Union Pacific Railroad Co.,* 195 F. Supp. 2d 1074, 1077-78 (C.D. Ill. 2002) (citing *Empey v. Grand Trunk Western Railroad Co.*, 869 F.2d 293 (6th Cir. 1989)). In *Empey*, the Sixth Circuit "join[ed] the Second and Third Circuits in holding that an employee who is injured while he avails himself of housing which his employer has provided and implicitly encouraged him to use is within the scope of his employment for purposes of the FELA." *Empey,* 869 F.2d at 295.

In his supplemental brief Plaintiff also cites *Sinkler v. Missouri Pacific Railroad Co.*, 356 U.S. 326, 78 S. Ct. 758, 2 L. Ed. 2d 799 (1958). In *Sinkler*, the plaintiff was working as a cook on a private car of the defendant railroad when, through the fault of a switching crew employed by another railroad company, the train upon which the plaintiff was working collided with another

16

train, causing him injury.  The Court found that "[i]t is manifest that the corporate autonomy of the [railroad company whose crew was negligent], and its freedom from detailed supervision of its operations by [defendant railroad], are irrelevant inasmuch as the switching crew [of the other railroad company] at the moment of collision in the station was engaged in furthering the operational activities of [the defendant railroad]." 356 U.S. at 331.  The Court "therefore h[e]ld that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of FELA." *Id.* at 331-32.

In this case, although there is no evidence on this record of a contractual relationship between O-N Minerals and Defendant, there is evidence of an implicit agreement or license to permit Defendant's employees to enter the gated area and proceed over O-N Mineral's property to reach the employer's vessels.  Accordingly, I suggest there is sufficient evidence to survive summary judgment on this imputation/agency ground for the reasons stated above and under the course of employment element.


**ii.**     **Whether Defendant or Its Agent Played a Part in the Injury**

"Under the Jones Act, a plaintiff need only show that the defendant's actions, however slight, contributed in some way toward causing the plaintiff's injuries." *Miller, supra.*  However, "[a]n injury alone does not create Jones Act liability; the plaintiff must show that the employer's conduct fell below the required standard of care." *Schouweiler v. Western Towboat Co.*, No. C05-502Z, 2007 WL 4410252 (W.D. Wash. Dec. 14, 2007) (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997)).  "[T]he phrase 'in whole or in part' as set forth in the statute, or, as it has come to be known, 'slightest,' modifies only the causation prong of the inquiry.  The

phrase does not also modify the word 'negligence.'  The duty of care owed, therefore, . . . retains

the usual and familiar definition . . . ." *Gautreaux*, 107 F.3d at 335.  *Accord Crawford v. Falcon*

*Drilling Co.*, Inc., 131 F.3d 1120, 1125 (5th Cir. 1997); *but see Williams v. The Long Island R.R.*

*Co*, 196 F.3d 402 (2d Cir. 1999) (the Second Circuit applies a relaxed standard for negligence as

well as causation under FELA).

Plaintiff testified at his deposition that he had traveled on the gravel road leading to the

dock, had just gone through the "tunnel," reached the bar or barricade at the end of the tunnel, had

stopped (as the bar requires one to do), and had just gotten back on his bike and moved

approximately four feet from the barricade when he slipped on loose gravel, fell, and was injured.

(Doc. 28 at 4, Pl.'s Dep. at 8-9.)  Plaintiff further testified that this area was in about the same

condition on the day he was injured as it always had been.  (Doc. 24, Ex. A at 5; Doc. 28, Ex. 5

at 4, Pl.'s Dep. at 19.)  Once a person moves around the bar or barricade, that person is considered

to be on the dock.  However, an examination of the pictures included in Plaintiff's responsive brief

reveals that the barricade at the end of the tunnel is approximately in the middle of an area where

one turns either right or left and is required to travel a distance large enough to accommodate the

width of a docked vessel in order to reach either the north or south dock, both of which run

perpendicular to this area.  (Doc. 28 at Ex. C.)  At the time of Plaintiff's injury, he was attempting

to reach the north dock, which would require him to travel to the left of the "tunnel" and its

barricade.  (Doc. 28, Ex. D at 4.)  I further note that it is apparent from these pictures that the

condition of the area where Plaintiff was injured is similar to a rural gravel road or driveway that

has acquired fairly large potholes.  The dock itself appears to be made of concrete or stone. (*Id*.)

Plaintiff's proffered expert notes that the "road surfaces upon which [Plaintiff] was

bicycling were replete with water-filled potholes, highly uneven and undulating surfaces, and

covered with loose debris and stones. . . . The road was not recently graded." (Doc. 28 at Ex. E.) While Plaintiff is in theory correct that the gravel road could have been graded to reduce the potholes and the undulation of the surface, there is no evidence in this record that failure to do so contributed to Plaintiff's injury. Plaintiff testified at his deposition that loose gravel was the only problem he encountered. (Doc. 28, Ex. C at 7.) He further testified that the area was in "basically the same" condition as it had been for some time. Moreover, Plaintiff testified that he had ridden his bike through the area many times and had "never had a problem" in the past. (*Id.*)

In *Przybylinski v. CSX Transp., Inc.*, 292 Fed. App'x 485 (6th Cir. 2008), the plaintiff was injured when she either caught her boot in metal grating, tripped over a 1/4-inch difference in walking surfaces, or tripped on the screws or fasteners that held down the grating sections found on walkway of train bridge. Summary judgment was granted to defendant, and the court stated that "it is not unreasonable to have such de minimis irregularities in a walking surface," and to hold otherwise would "either turn FELA into a strict liability statute . . . or require that under FELA, the railroad must provide a perfectly safe working environment. Neither is the law." *Id.* at **5.

In this case I similarly suggest that neither Defendant or O-N Minerals can be considered negligent for failing to make the area – a gravel road – perfectly free from undulations or loose gravel. Instead, I suggest the evidence shows that Plaintiff's own negligence was the sole cause of his injury. As a result, I suggest that Plaintiff has not come forward with sufficient evidence to create a genuine issue of material fact as to the negligence element of his Jones Act claim. I therefore suggest that, while there may be a genuine issue as to whether Plaintiff was in the course of employment at the time of his fall, there is in this record insufficient evidence to create a genuine issue of material fact as to whether either the named Defendant or O-N Minerals was

negligent or in any way caused or contributed to Plaintiff's injury and therefore that Defendant's motion for summary judgment should be granted.

### c. Other arguments presented

### i. Ingress/egress doctrine

Defense counsel contended at oral argument that the "ingress/egress doctrine" of admiralty law limits the scope of an employer's duty to a narrow area immediately surrounding the gangway of a vessel. In reply, Plaintiff's counsel contended that Defendant's liability, if limited at all, would end at the gate marking the entrance into the area. During oral argument, Defense counsel mused why the line should be drawn at the gate if, as Plaintiff maintained, the ingress/egress doctrine is effectively to be ignored.

In *Marceau, supra*, the Second Circuit set forth the "ingress/egress doctrine." In that case the plaintiff ship's cook had been ashore for personal recreation and was returning to the ship to report for duty as ordered when he walked up the dock toward the boat and approached a ladder that belonged to the ship and which ran from the dock to the deck of the ship. *Id.* at 417. This ladder was the recognized mode of ingress and egress from the vessel for the crew. *Id.* Within three to five feet from the base of the ladder, the plaintiff slipped and fell and injured himself. *Id.* Flour had been spilled in the area while loading cargo the previous day, it had become wet from rain or snow, and someone had sprinkled the area with sawdust in hopes of rendering the area safe. *Id.*

The court held that the plaintiff was "acting under orders when he returned to the ship" and "was not only acting in the course of his employment but suffered his injuries while on property in the possession and under the control of the defendant as lessee and over which the plaintiff had to pass in order to return to his work." *Id.* at 418. The court then stated that, under precedent, "a

20

man is acting in the course of his employment when coming to or returning from work and upon the employer's premises or upon adjacent property if approaching by a customary route." *Id.* (citing *Wong Bar v. Suburban Petroleum Transport,* 119 F.2d 745 (2d Cir. 1941) (seaman in the course of his employment when leaving work on tugboat for home and who had to get on the deck of a barge lying at the stern of the tugboat and then pass from the barge to the dock was injured when he used a ladder to bridge the four-foot gap from the tug to the barge and another seaman held the ladder but let go of the ladder before the plaintiff had safely stepped onto the barge; court noted that "an employee continues in the course of his employment until he has left his place of employment"), and *Erie R.R. Co. v. Winfield*, 244 U.S. 170, 37 S. Ct. 556, 61 L. Ed.1057 (1917) (railroad employee could recover under FELA for injuries sustained while leaving work for the day and passing through the freight yard of the railroad)).  Thus, while the ingress/egress doctrine contemplates that a seaman will be considered acting in the course of his employment when actually accessing the vessel, neither this doctrine nor the cases establishing it abrogate the element of negligent action on the part of a defendant.

Moreover, since the *Daughenbaugh* holding post-dates the cases cited by Defendant regarding the ingress/egress doctrine,[11] I suggest that *Daughenbaugh* controls and vitiates the more narrowly drawn ingress/egress doctrine as advanced by the parties.

### ii.    Open and Obvious Danger

Defendant argues that it was "not under any duty to warn plaintiff of any alleged danger caused by loose gravel on the dock, because that condition was open and obvious."  (Doc.  24 at 12-13.)  Under the Jones Act, an employer has a duty to effectively warn employees of dangers

---

[11]Defendant also cites *Paul v. U.S.*, 205 F.3d 38 (3rd Cir. 1953); *Dangovich v. Isthmian Lines, Inc.,* 218 F. Supp. 235 (D.C. N.Y. 1963) (shipowner under no duty to provide crew with transportation from and to the vessel while on shore leave and no duty to warn of dangers in area beyond gangway); *Wheeler v. West India S.S. Co.*, 103 F. Supp. 631 (D.C. N.Y. 1951).

not reasonably known; however, "shipowners need not warn seamen of dangers that are 'open and obvious.'" *Patterson v. Allseas USA, Inc.*, 137 Fed. App'x 633, 637 (5th Cir. 2005). *See also D'Costa v. United States Lines Company*, 227 F. Supp. 180, 181-82 (S.D.N.Y 1964) (granting summary judgment on unseaworthiness claim and Jones Act claim where plaintiff was injured while on shore leave, stating that "[t]he law is clear that a ship owner is not under duty to warn crew members who are going ashore for their own pleasure of the existence of possible dangerous conditions in a shore area beyond the ship's control" (citing *Thurnau v. Alcoa Steamship Company, Inc.*, 229 F.2d 73, 74 (2d Cir. 1956) (shipowner is not "under a duty to provide a safe means of transportation between the ship and any place of amusement crew members desire to visit while on shore leave in the vessel's home port . . . and is therefore not liable under the Jones Act."))).[12]   However, Plaintiff has not alleged a failure-to-warn claim. Instead, Plaintiff alleges that defendant failed to make the area safe. (Doc. 1 at 3.) Therefore, I suggest that the open and obvious defense is not applicable to the instant case.

## E.   Unseaworthiness

### 1.   Standards

An unseaworthiness claim is wholly distinct from a negligence claim under the Jones Act. "A ship owner is strictly liable for personal injuries caused by his or her vessel's 'unseaworthiness.'" *Churchwell*, 444 F.3d at 904 (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960) (ship's rail made slippery by fish gurry)). "Unseaworthiness is a condition, and how that condition came into being - where by negligence

---

[12]The court in *Thurnau* also found the cases the plaintiff relied on to be "distinguishable" because they were "maintenance and cure cases [such as] *Warren v. United States.*" *Id.*

or otherwise - is quite irrelevant to the owner's liability for personal injuries resulting from it." *Perkins v. Am. Elec. Power Fuel* Supply, 246 F.3d 593, 602 n.6 (6th Cir. 2001).

A vessel is considered unseaworthy if the vessel and its appurtenances are not "reasonably fit for their intended use." *Mitchell*, 362 U.S. at 550. To prove a claim of unseaworthiness, a plaintiff must show (1) that the scope of the warranty of unseaworthiness extends to him and his duties; (2) that the injury was caused by a piece of the ship's equipment or appurtenant appliances; (3) that the equipment was not reasonably fit for its intended use; and (4) that the unseaworthy condition was a proximate cause of the plaintiff's injuries. *Gebhard v. S.S. Hawaiian Legislator*, 425 F.2d 1303, 1310-13 (9th Cir. 1970). To show that the unseaworthiness of the vessel proximately caused his injuries, a plaintiff must prove that unseaworthiness "played a substantial part in bringing about or actually causing the injury and the injury was either a direct result or a reasonably probable consequence of unseaworthiness." *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1463-64 (6th Cir. 1993) (citations omitted).

Unseaworthiness can arise from defective gear, an unfit or understaffed crew, use of an improper method of storing or unloading cargo, or misuse of properly-functioning equipment when so directed by a superior. *Churchwell*, 444 F.3d at 904. The existence of a safe alternative that the plaintiff failed to use does not bar an unseaworthiness claim. Its existence may be used by a factfinder to lessen the liability of the shipowner and reduce the amount of damages. *Id.* at 908.

> [I]f the claimant is injured by equipment that was part of the vessel's usual gear, or was stored on board, or is in some way attached to the vessel, the maritime location prong of the test would conclusively be met . . . [however] piers and docks have consistently been considered extensions of land and the injuries inflicted to them or incurred on them are not compensable under maritime law unless said injury was caused by a vessel on navigable waters . . . Accordingly, the Supreme Court held in *Victory Carriers* that it would not extend the reach of federal law to pier-side accidents caused by pier-based equipment when said equipment was not part of the vessel's usual gear.

*Torres Vasquez v. Commercial Union Ins. Co.*, 367 F. Supp. 2d 231, 236 (D. Puerto Rico 2005) (dismissing unseaworthiness claim where plaintiff was injured by a crane used to load the vessel that was land-based and was not operated or maintained by vessel owner) (citing *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 92 S. Ct. 418, 30 L. Ed. 383 (1972)).

### 2.    Application

In *Henry v. S.S. Mount Evans*, 227 F. Supp. 408 (D.C. Md. 1964), the plaintiff was injured when his leg went through a concealed hole in the floor of a chandler's truck which was at the side of the vessel for the purpose of loading supplies such as vegetables onto the vessel. *Id.* at 409. The district court noted that "the fact that a seaman is sent to work on a dock, or on a truck, or in a warehouse, or is sent by an automobile to a store to buy something for the ship, does not make the dock, the truck, the warehouse or the automobile an extension of the ship; the warranty of seaworthiness does not extend to all equipment which is on or part of the dock, the truck, the warehouse or the automobile [and] [i]n the present case the truck was neither a part of the ship's equipment nor a defective cargo container." *Id.* at 410. Similarly, in the instant case, I suggest that it cannot seriously be argued that a gravel access path over 100 feet from the vessel is an appurtenance of the vessel. *See also O'Donnell v. Jean McCausland*, LLC, No. 04-CV-175-PB, 2005 WL 3133034, at *7 (D.N.H. Nov. 17, 2005) (winch on dock that was not owned or operated by vessel owner and which was not being used to perform a function that was important to the vessel's operation was not an appurtenance).

I therefore suggest that summary judgment be granted in favor of Defendant on Plaintiff's unseaworthiness claim as well.

**F.      Conclusion**

For all the reasons stated above, I suggest that summary judgment be granted in favor of the Defendant on both the Jones Act and unseaworthiness claims, and that the case be dismissed in its entirety.  Accordingly, I further suggest that Defendant's motion to strike Plaintiff's expert report be denied as it is moot.


**III.   <u>REVIEW</u>**

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


　　　　　　　　　　　　　　　　　　　s/ *Charles E. Binder*

　　　　　　　　　　　　　　　　　　　CHARLES E. BINDER

Dated: April 1, 2009　　　　　　　　　United States Magistrate Judge


CERTIFICATION

　　I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on George Fishback, Amria Ahmed, Robert Burger, Harold Henderson, Joshua Klarfeld and Paul Galea; and served on District Judge Ludington in the traditional manner.

Date:  April 1, 2009　　　　　　　　By　　s/Jean L. Broucek
　　　　　　　　　　　　　　　　　Case Manager to Magistrate Judge Binder